A COMPLAINT UNDER THE CIVIL RIGHTS ACT,
42 U.S.C. §1983

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

Erin A. Hunter

111799
Inmate (DOC) number

(Enter above the full name of each
plaintiff in this action.)

VERSUS

Harold Sterling

Joseph Dufour

James LeBlanc

Burl Cain, et al.

(Enter above the full name of each
defendant in this action.)

Instructions for Filing Complaint by Prisoners
Under the Civil Rights Act, 42 U.S.C. §1983.

This packet includes two copies of a complaint form and one copy of the pauper affidavit.

IF YOU ARE A PARISH PRISONER, you must file an original and one copy of your complaint for each defendant you name. For example, if you name two defendants, you must file the original and two copies of the complaint. You should also keep an additional copy of the complaint for your own records.

IF YOU ARE A D.O.C. PRISONER, you must file an original and one copy of your complaint. If the defendants are still employed by the Department of Public Safety and Corrections, only one service copy is needed. Otherwise, you must supply a copy of the complaint and the service address for each defendant no longer employed by the Department of Public Safety and Corrections.

**All copies of the complaint must be identical to the original.**

The names of **all parties** must be listed in the caption and in part III of the complaint **exactly**

**the same**.
          In order for this complaint to be filed, it must be accompanied by the filing fee of $ 150.00.
In addition, the United States Marshal will require you to pay the cost of serving the complaint on
each of the defendants.

          If you are unable to pre-pay the filing fee and service costs, you may petition the court to
proceed in forma pauperis. For this purpose, a pauper affidavit is included in this packet. You must
sign the affidavit, and obtain the signature of an authorized officer certifying the amount of money
in your inmate account. If pauper status is granted, you will be required to pay an initial partial filing
fee and thereafter, prison officials shall be ordered to forward monthly payments from your inmate
account until the entire filing fee is paid.

          You will note that you are required to give facts. THIS COMPLAINT SHOULD NOT
CONTAIN LEGAL ARGUMENTS OR CITATIONS. ALSO, <u>DO NOT INCLUDE EXHIBITS</u>.

          When you have completed these forms, mail the original and copies to the Clerk of the
United States District Court for the Middle District of Louisiana, 777 Florida Street, Suite 139,
Baton Rouge, La. 70801-1712.

I.        Previous Lawsuits

          A.  Have you begun other lawsuits in state or federal court dealing with the same facts
          involved in this action or otherwise relating to your imprisonment?    Yes ( )  No (✓)

          B.  If your answer to A is yes, describe each lawsuit in the space below. (If there is more
          than one lawsuit, describe the additional lawsuits on another piece of paper, using the same
          outline.)

               1.  Parties to this previous lawsuit
                    Plaintiff(s): _____
                    _____

                    Defendant(s): _____
                    _____

          2.  Court (if federal court, name the district; if state court, name the parish):
               _____
               _____

          3.  Docket number: _____

          4.  Name of judge to whom case was assigned: _____
               _____

2

5. Disposition (for example: Was the case dismissed? Was it appealed? Is it still pending?):

_____

_____

6. Date of filing lawsuit: _____

7. Date of disposition: _____

C. Have you had any previously filed federal lawsuits or appeals, whether or not related to the issues raised in this complaint, dismissed by any federal court as frivolous, malicious, or for failure to state a claim for which relief can be granted?

     Yes ( )     No ( )

If your answer is yes, list the civil action numbers and the disposition of each case. You must identify in which federal district or appellate court the action was brought.

_____

_____

II.    Place of present confinement: _____

A. Is there a prisoner grievance procedure in this institution?
    Yes (✓) No ( )

B. Did you present the facts relating to your complaint in the state prisoner grievance procedure?
Yes (✓) No ( )

C. If your answer is Yes:

1. Identify the administrative grievance procedure number(s) in which the claims raised in this complaint were addressed. LSP-2008-0116-W/LSP-2008-0912

2. What steps did you take? Sought reviews to the Secretary of the Department of Correction

3. What was the result? Denied

D. If your answer is No, explain why not: _____

3

III.    Parties
(In Item A below, place your name in the first blank and place your present address in the second blank. Do the same for additional plaintiffs, if any.)

A. Name of plaintiff(s) Erin A. Hunter
   Address Louisiana State Penitentiary, Angola, La. 70712
In Item B below, place the full name of the defendant in the first blank, his official position in the second blank, and his place of employment in the third blank. Use Item C for the names, positions, and places of employment of any additional defendants.

B. Defendant See attached suit litigation is employed as
_____ at _____

C. Additional Defendants: See attached suit litigation
_____
_____
_____

IV.    Statement of Claim

State here as briefly as possible the facts of your case. Describe how each defendant is involved. Include also the names of other persons involved, dates, and places. **Do not given any legal arguments or cite any cases or statutes.** If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. (Use as much space as you need. Attach extra sheets if necessary.)

See attached suit litigation
_____
_____
_____
_____
_____
_____
_____
_____

4

_____

_____

_____

_____

V.    Relief

<u>State briefly exactly what you want the court to do for you.</u> Make **no** legal arguments. Cite

no cases or statutes. Attach no exhibits.  *See attached suit litigation*

_____

_____

_____

VI.    Plaintiff's Declaration

1. I understand that I am prohibited from bringing a civil action in **forma** pauperis if, while I was incarcerated or detained in any facility, I have brought three **or** more civil actions or appeals in a court of the United States that were dismissed on the grounds that they were frivolous, malicious, or failed to state a claim upon which relief **may** be granted, unless I am in imminent danger of serious physical injury.

2. I understand that even if I am allowed to proceed in forma pauper**is,** I am responsible for paying the entire filing fee and any costs assessed by the Court, which, after payment of the partial initial filing fee, shall be deducted from my inmate account **by** my custodian in installment payments as prescribed by law.

3. I understand that if I am released or transferred, it is my responsibility to keep the Court informed of my whereabouts and failure to do so may result in this **action** being dismissed with prejudice.

Signed this *12th* day of *December* _____, 200*8* .

_____

*Erin Hensler*
Signature of plaintiff(s)

5

# IN THE
## UNITED STATES MIDDLE DISTRICT
## COURT OF THE STATE OF LOUISIANA

Erin A. Hunter,                                    Civil Action No. _____

          Plaintiff

    vs.

James LeBlanc

Burl Cain, N.

Darryl Vannoy

Harold Sterling

Billy Mock

Patrick Woods

Eric Hinyard

Trish Foster

Tim Delaney

Juan Conrad

Paul Smith

_____ Cole

Jordan Bordelon

Leonard Wilson,

         Defendants

## I. JURISDICTION
### (1)

This is a civil action authorized by 42 U.S.C. Section 1983 to redress the deprivation, under color of

1.

State law, of rights secured by the Constitution of the United States. The court has jurisdiction under 28 U.S.C. Section 1331 and 1343 (A)(3). Plaintiff seeks declaratory relief pursuant to 28 U.S.C. Section 2201 and 2202. Plaintiff claims for injunctive relief are authorized by 28 U.S.C. Section 2283 & 2284 and Rule 65 of the Federal Rules of Civil Procedure.

(2)

The United States Middle District Court for Louisiana is an appropriate venue under 28 U.S.C. Section 1391 (b)(2) because it is where the event giving rise to this claim occurred.

## II. PLAINTIFF

(3)

Plaintiff, Erin Hunter, is and was at all times mentioned herein a prisoner of the State of Louisiana in the custody of the Louisiana Department of Correction.

(4)

Plaintiff is currently confined in the Louisiana State Penitentiary at Angola, Louisiana.

## III. DEFENDANTS

(5)

Defendant, James LeBlanc, is the secretary of the Department of Safety and Correction. He is legally responsible

2.

for the overall operation of the Department and each institution under its jurisdiction, including the Louisiana State Penitentiary at Angola.

(6)

Defendant, Burl Cain, is the warden of the Louisiana State Penitentiary. He is legally responsible for the operation of the Louisiana State Penitentiary and for the welfare of all the inmates of this prison.

(7).

Defendant, Darryl Vannoy, is the deputy warden over security in the Louisiana State Penitentiary at Angola. He is legally responsible and supervise all security guards.

(7A)

Defendant, Trish Foster, is the Director of legal programs in the Louisiana State Penitentiary at Angola. She is legally responsible and supervise all inmate counsels and Administrative Remedy Procedures.

(8)

Defendant, Tim Delaney, is an Assistant Warden in the Louisiana State Penitentiary at Angola. He is legally responsible for the operation of Camp D inmate population.

(9)

Defendant, Harold Sterling, is a correctional officer of the Louisiana Department of Correction

3.

who, at all times mentioned in this complaint, held the rank of Lieutenant Colonel over security teams B and D, and was assigned as Disciplinary Board chairman on occasions, as shift supervisor to the below defendants.

(10)

Defendant Billy Mock is a correctional officer of the Louisiana Department of Correction who, at all times mentioned in this complaint, held the rank of Major of B-Team at the Louisiana State Penitentiary, Camp D.

(10-A)

Defendant Patrick Woods is a correctional officer of the Louisiana Department of Correction who, at all times mentioned in this complaint, held the rank of captain of B-Team at the Louisiana State Penitentiary, Camp D.

(11)

Defendant, Eric Hinyard is a correctional officer of the Louisiana Department of Correction who, at all times mentioned in this complaint, held the rank of Major of D-team at the Louisiana State Penitentiary, Camp D

(12)

Defendant Juan Conrad is a correctional officer of the Louisiana Department of Correction who, at all times mentioned in this complaint, held the rank of Captain of D-team at the Louisiana State Penitentiary, Camp D.

4.

(13)

Defendant, Paul Smith, is a correctional officer of the Louisiana Department of Correction who, at all times mentioned in this complaint, held the rank of Captain of D-team at Camp D, Louisiana State Penitentiary.

(14)

Defendant, Joseph Dufour, is a correctional officer of the Louisiana Department of Correction who, at all times mentioned in this complaint, held the rank of Captain of B-team at Camp D, Louisiana State Penitentiary.

(15)

Defendant, _____ Cole, is a correctional officer of the Louisiana Department of Correction who, at all times mentioned in this complaint, held the rank of Lieutenant of D-team at Camp D, Louisiana State Penitentiary.

(16)

Defendant, Jordan Bordelon, is a correctional officer of the Louisiana Department of Correction who, at all times mentioned in this complaint, held the rank of Lieutenant of B-team at Camp D, Louisiana State Penitentiary.

(17)

Defendant, Leonard Wilson, is a correctional officer of the Louisiana Department of Correction who, at all times mentioned in this complaint, held the rank of Cadet of B-Team at the Louisiana State Penitentiary, Camp D.

(17A)

Each defendant is sued individually and in his official capacity. At all times mentioned in this complaint each defendant acted under the color of state law.

## IV. FACTS

(18)

During the late month of April, or early month of May 2007, inmate counsel Dwight Bell was performing his assigned job when he was effectively representing an inmate in Disciplinary Court on a rule infraction, and doing so, he filed several motions on the inmate behalf.

(19)

The Board Chairman, Lt. Col. Harold Sterling, was very disturbed with having to rule on the motions so after the hearing he gave Bell a direct order not to file any more motions in DB court.

(20)

Thereafter, on the above day, Lt. Col. Sterling called inmate counsel James Matthew to his office in the Education Building and told him to inform all inmate counsels (Robert Swift, Ricky Carthan,

Dwight Bell and Ralph Stogner) that he do not
want any more motions filed in DB court.
(21)

Matthews was assigned by Ms. Foster as an
inmate counsel coordinator to the inmate counsels
at Camp D. His primary job function is to co-
ordinate case assignments to the above inmate
counsels, as well as himself, and to maintain a
weekly schedule for each inmate counsel to re-
present inmates at DB court.
(22)

Matthews complied with Lt. Col. Sterling's order
by telling the above inmate counsels that they
could not file any more motions in DB court
-- per do order of Lt. Col. Sterling.
(23)

However, compliance with Lt. Col. Sterling's
derelict order became short lived. Shortly there-
after Bell appeared in DB court with an inmate
and filed motions. And who was happens to be
the DB chairman -- Lt. Col. Sterling.
(24)

Lt. Col. Sterling was visibly upset with what
appears to be Bell's insubordination. But what

he did not know was that Bell was under demand
by his client to file motions.  This was the beginn-
ing of Lt. Col. Sterling's rage against inmate
counsels.

(25)

To make matters worse, the following week,
which was May 11, 2007, inmate counsel Ralph
Stogner went before Lt. Col. Sterling representing
inmate Antonio Bosley.

(26)

In the middle of the hearing, Lt. Col. Sterling
cut off the tape recorder and ordered Stogner
and Bosley out the court room.  When called back
in, Stogner reminded Lt. Col. Sterling that he was
not suppose to cut the tape off in the middle
of the hearing.

(27)

After the hearing, Lt. Col. Sterling again called
inmate James Matthews to his office.  He told
him that Stogner was a damn inmate and he can-
not (Stogner) could not tell him (Sterling) what to
do.

(28)

He then told Matthews to relay his message to the

9.

inmate counsels, which he did. Minutes later, on this very same day, Lt. Col. Sterling ordered his subordinates to shake down the inmate counsels' office and to write them up.

(29)

At approximately 10:30 a.m., on the above day, Camp D security officers came in the Legal Aid office and ordered all the inmate counsels to go to their living quarters.

(30)

All the above inmate counsels were written up for contraband and property destruction when security was the ones destroying property.

(31)

The contraband consisted of food items brought from the prison canteen, razor blades that counsels use to cut paper with, and medication found in inmate counsel Robert Swift area with another inmate name on it.

(32)

The property destruction was a metal file binder taken from one of the desk drawers. They were apart of the desks which all the desks have them. Moreover, the desks were there

before the above inmate counsels and at the present, the desks and binders are still there.

(33)

One of the security officers took pictures of the pile of food items and trash they left in the office.

(34)

Upon information and belief, Lt. Col. Sterling ordered security to take pictures and bring them to him, which they did.

(35)

On May 12, 2007, the very next day, the above inmate counsels sought-out, then assistant warden of Camp D, Soc La Martinere, to talk with him about Lt. Col. Sterling harassment and vindictive behavoir.

(36)

On this very same day a meeting was held in the colonels' office with Assistant Warden La Martinere, Colonel Sharp, Lt. Col. Sterling and all the above inmate counsels.

(37)

Inmate Matthews told Asst. Warden La Martinere (in words not to invoke another retaliation from

10.

Lt. Col. Sterling) that the search stems from inmate counsels trying to perform their job in DB court. He went on to explain how Lt. Col. Sterling limited inmate counsels ability to properly prepare a defense by filing motions. That Lt. Col. Sterling gave a direct order to inmate counsels not to file any more motions in DB court and when inmate Bell was forced to disobey that order, and when inmate Stogner told Lt. Col. Sterling that he could not turn the tape off in the middle of hearing, Lt. Col. Sterling in turned ordered security to shake down the office and write the counsels up.

(38)

Asst. Warden La Martinere respond that it was inmate counsels duty to file motions in DB court and that they are allowed to do so. He failed to elaborate on the search and counsels being written up.

(39)

More discussion of this matter must have taken place behind close doors because the inmate counsels were not harassed~~any more~~ any more under his authority over CAMP D.

11.

(40)

On May 15, 2007, Lt. Col. Sterling took off the robe of instigator and became the executioner. Upon information and belief, he was the DB chairman.

(41)

Before the start of court, he gave each inmate counsel an ultimatum to plead guilty to 30-days suspended sentence, or as to Matthews and Swift, lose their trustee status, and to Bell, lose his job and go to the working cell blocks.

(42)

Under duress and intimidation, all the above inmate counsels took the plea bargain.

(43)

Soon after Warden La Martinere was promoted to a higher position, and Asst. Warden Tim Delaney took his place as warden over Camp D, Lt. Col. Sterling re-instituted his harassment and intimidation on counsels.

(44)

Some time in the latter months of 2007, Lt. Col. Sterling ordered his subordinates, Capt. Patrick Woods and two other unknown security officers to shake down the inmate counsels' office. This time none of the inmate counsels were not written up but

they ramshackled the office.

(45)

At this time plaintiff was an inmate counsel
and Bell and Swift had since lost their job as
inmate counsels for reasons relevant to Lt. Col.
Sterling's rage.

(46)

On January 11, 2008, Lt. Col. Sterling struck
again. This time he ordered D-Team, the
night shift, Major Eric Hinyard, Captain Susan
Conrad, Captain Paul Smith and Lieutenant
Cole to shake the Legal Aid office down and
write the counsels up for rule infractions.

(47)

It was approximately 12:30 in the morning when
Major Hinyard called the dorm security to wake the
plaintiff up to report to his office. Upon arriving,
plaintiff met up with inmates Matthews and Car-
than who was also called. Both Matthews and Car-
than lived in Eagle Unit Four, the plaintiff, in
Falcon Unit One.

(48)

When arriving at Major Hinyard's office, him
and Capt. Conrad told counsels he was ordered to

13.

shake the office down. Everything was taken
out the office - computers, books, file cabinets etc., and
lined up in the hallway on the floor.

(49)

Major Hinyard, Capt. Conrad, Capt. Smith and Lt.
Cole conducted a thorough search which lasted to
2:30 a.m.  At the end of the search pictures were
taken of the mess they created and the counsels were
written up for contraband.

(50)

In plaintiff's case, he was written up for food
items brought from the prison canteen, a homemade
pecan cracker made in the hobby shop, a large bag
of pecan left over from the Christmas party, one
personal photograph, a pair shoes, a State issued coat
and sweat shirt, a pair of leather gloves that be-
longs to inmate Stegner which he use to support him
rolling around in his wheelchair, and $41.47 worth
of old stamps that plaintiff brought from the prison
canteen over the years and was used for certified
mail.  Most of the stamps were $32, $37 and $39.

(51)

When the counsels were called to Major Hinyard's
office to be notified that they were being written

14.

up, inmate Matthews asked him and Capt. Conrad
what was this for? Both security officers
responded, Lt. Col. Sterling ordered them to
do it.

### (52)

The next day, January 13, 2008, the counsels
sought out Warden Delaney to tell him about
Lt. Col. Sterling's harassment, but inmate Matthews
caught up with Lt. Col. Sterling first in his
office.

### (53)

He told Lt. Col. Sterling as a result of the
search on the inmate counsels' office, an inmate
legal documents cannot be found and Ralph
Stogner's computer key board some how came
up broken

### (54)

He reminded Lt. Col. Sterling that Warden
La Martinere authorized inmate counsels to have
food in the office because of the long hours
counsels work.

### (55).

Upon belief and information, Lt. Col. Sterling's
only response was that inmate counsels are not

to have food items in the office.

(56)

On this same day when the shift was changing and the night shift (D-Team) was coming on, Lt. Col. Sterling through a cross with what inmate Matthews told him about the missing document and broken key board.

(57)

D-team supervisor, Major Hinyard called Matthews out of the office to ~~meet him~~ meet him on the walk, which is the sidewalk outside of the building. There, Major Hinyard told him what Lt. Col. Sterling told him, that Matthews accused him of losing an inmate legal document, and that he broke a key board while conducting the search.

(58)

Matthews tried to explain to him that he never accused him of anything. But Major Hinyard insisted he was lying and he threaten Matthews with him better not having any food in the office or that he was going to write him up.

(59)

Matthews came back to the office and told plaintiff, Carthan and Stogner what had happened.

16.

All the counsels immediately left the office and
went to their dormitories because Major Hinyard
and Capt. Conrad have a reputation in beating
and setting inmates up with fabricated write-
ups.

(60)

This was on a Friday. For the entire week-
end, the above counsels went to their dormitories
before Major Hinyard's shift came on because
of fear.

(61)

It was at this time that plaintiff begin
drawing up a complaint to Asst. Warden Delaney
and Ms. Trish Foster on Lt. Col. Sterling abusing
his authority by harassing and intimidating
inmate counsels.

(62)

That Following Monday, on January 14, 2008, the
inmate counsels setup a meeting with Warden Delaney
and told him all the above. At the conclusion of
the meeting, Warden informed the inmate counsels
that he was going take care of the matter.

(63)

On January 15, 2008, around 9:45 p.m., while

17.

enroute to Falcon One dormitory, Capt. Bradley
(of C-team) stopped this plaintiff and told him
that he better not breathe too heavy because
his head is on the chopping block.

(64)

After Capt. Bradley's warning, the next day
plaintiff amended his complaint to reflect Capt.
Bradley's warning and immediately sent it out
for copies - inadvertently forgetting to update
the January 14, 2008 date on the complaint.
(See exhibit "A").

(65)

Upon receiving the copies, plaintiff immediately
sent Asst. Warden Delaney and Ms. Trish Foster
the originals.

(66)

Both Asst. Warden Delaney and Ms. Foster fail-
ed to respond.

(67)

On January 25, 2008, the prison administration
finally responded to plaintiff's complaint.
Over the course of their silence, the prison
administration was secretely plotting plaintiff
demise. Coincidently, they mysteriously received

19.

confidential information this plaintiff was
trying to sell a homemade handcuff key. The
problem with this information is that they
used the wrong person to plant it.

(68)

To whom this plaintiff was allegally trying
to sell this mysterious key to, the administration
cannot say.

(69)

To whom plaintiff was allegedly obtained
possession of this mysterious key, the Admin-
istration cannot say. Simply because the in-
formation is not true.

(70)

A search was conducted on plaintiff's dormi-
tory locker boxes and an allege homemade hand-
cuff was found, but someone from the Admin-
istration forgot to tell the dorm cadet who
conducted the search.

(71)

This is where Capt. Bradley warning come to
light.

(72)

January 25, 2005 was a Friday. The last day

19.

of plaintiff's week to work DB court. As normal,
plaintiff got up when the dorm lights came on,
5:30 a.m. He fixed his bed. Grabbed his hygiene
equipments and strolled to the shower area to
take a shower.

(73)

While in the shower, he observed Capt.
Dufour and Lt. Bordelon standing by the se-
curity counter looking in the bed area of
the dormitory. After not finding what they
were looking for, Lt. Bordelon made a 90 degree
turn to his left and spotted plaintiff in the
shower. He then told Capt. Dufour "there he
go." Capt. Dufour was new in the camp and did
not know the plaintiff. He directed Cadet
Leonard Wilson to go with Lt. Bordelon in the
dorm area while he remained at the security
counter.

(74)

About five minutes later Lt. Bordelon and
Cadet Wilson returned to the security counter.
Capt. Dufour and Lt. Bordelon left the dormitory
without saying a word.

20.

(75)

The plaintiff got out the shower and found his bed area in disarray. He went to the security counter and asked Cadet Wilson what had happened. Cadet Wilson respond that he really did not know. All they told him was to shake plaintiff's bed area down.

(76)

20 to 30 minutes later, Cadet Wilson received a phone call from Lt. Bordelon to tell plaintiff to pack his belongings, that he was being locked up. Plaintiff asked what for and Cadet Wilson respond that he did not know.

(77)

Plaintiff actual lockup did not occur to 8:00 a.m. Up until that time, he was roaming the dormitory.

(78)

Enroute to Administrative lockup, plaintiff received a copy of his writeup from Lt. Bordelon. (See exhibit "B").

(79)

Plaintiff asked Lt. Bordelon, why the frameup? Lt. Bordelon respond that he had nothing to do with it.

21.

(90)

According to the writeup, it was written by Capt.
Dufour at approximately 5:50 a.m. He made the
following accusation:

"On the above date and time I Capt. Dufour
shaking down Ervin Hunter 111799 found a
Homemade handcuff key in his locker Box.
Major B. Mack notified."

(91)

On the above day, Plaintiff's job as an inmate counsel was
taken away and given to inmate Dwight Dewitt before
he had an opportunity to be adjudged guilty at a disci-
plinary hearing.

(92)

Also on January 28, 2008, before the finalization of disci-
plinary proceedings, plaintiff's dormitory bed was given
to inmate Alonzo Ford. A positive notion he was not
coming back.

(92A)

Normally, an inmate's bed is not given away until the
finalization of the proceedings. In plaintiff's case, he was
already prejudged.

(93)

On January 29, 2008, a disciplinary hearing was con-
ducted by Board Chairman Kevin Dupuis and Board

Member Candice Breechen. Plaintiff Filed two motions,
1 Motion to investigate/Grant lie Detector test/Dismiss,
and 2) Motion to have the Louisiana State Penitentiary
Attorney Terri Cannon present during deliberations.
(See Exhibit "C").

(84)

The Board denied all but plaintiff's motion to investigate
--limited to only obtaining a copy of Falcon One's log
book where Cadet Wilson logged in the search.

(84A)

The Board also granted plaintiff's request to enter
the informal complaint on Lt. Col. Sterling as evidence.

(85)

On January 31, 2008, another disciplinary hearing was con-
ducted. A copy of Falcon One's log book was among the
record along with an unrequested, self-serving investiga-
tory statement from Major Mack who in turned directed
his subordinates, Lt. Bordelon and Cadet Wilson to write
statements in attempt to coverup the setup. (See exhibit "D").

(86)

The log book reveals Cadet Wilson conducted the search on
plaintiff's bed area at 5:55 a.m. That he was ordered by
Capt. Dufour and Lt. Bordelon to conduct the search. Thus,
implying he conducted the search alone. and "found nothing."

(87)

What is interesting about this log book is
that it reveals Capt. Dufour at the security
counter while Lt. Bordelon and Cadet Wilson was
conducting the search. Just below Cadet Wilson
5:27 a.m. log, relieving C-Team, Capt. Dufour
writes the following:

"Capt. Dufour in dorm Lt. Bordelon
Cadet Wilson shake dorm bed #5"

(88)

Clearly, he described himself in the dorm and
that Lt. Bordelon and Cadet Wilson was shaking
down.

(89)

Finding that the log book contradicts Capt. Dufour's
writeup whereby exposing the setup, Major Mock
felt the urgency to go outside the scope of investi-
gation. He had Lt. Bordelon and Cadet Wilson to
write each a statement putting Capt. Dufour
in the search. (See exhibit "O").

(90)

Lt. Bordelon's statement describes him and
Capt. Dufour shaking down plaintiff's locker box
and finding the homemade handcuff key.

24a

(91)

Cadet Wilson's statement limits his search to only plaintiff laundry bag, but he maintains that he found nothing, and was never told by Capt. Dufour or Lt. Bordelon an allege homemade handcuff key was found. Apparently, Cadet Wilson was never told what he was suppose to be searching for, and the allege discovery.

(92)

According to Major Mock's investigative statement, security received information that "inmate counsels were dealing unauthorized items and canteen items for cigarettes and stamps." It is safe to assume that Major Mock is referring to the January 11, 2008 search upon inmate counsels' office. (See exhibit "D").

(93)

If this is his assertion, Major Hinyard's inventory confiscation report to Colonel Sharp and Lt. Col. Sterling would negate this statement. There, Major Hinyard reported that the search was conducted per order of Lt. Col. Sterling without giving any reasons.

(94)

In paragraph 4 of Major Mock's investigative

statement, he singles out only this plaintiff. It is
not about the inmate counsels any more, it is about
the plaintiff. The only inmate counsel who filed a
complaint against his supervisor, Lt. Col. Sterling.
(93)

Major Mack states, "[D]uring the course of the
investigation additional information was received
that indicated inmate Hunter had a handcuff key
that he might be trying to sell." Just so happens
this additional information mysteriously surfaces
after plaintiff filed his complaint.
(94)

Normally, when confidential information is at stake,
it is common practice in this institution that it be
accompany with a confidential informant report.
In plaintiff's situation, this was not the case.
(95)

On February 1, 2008, plaintiff attended his final
disciplinary hearing. He filed two additional
motions. 1) For a copy of the handcuff key and
time to prepare a defense; 2) For a copy of the
log book from Falcon Hall and a copy of the
alleged evidence (handcuff key). Both motions
were denied. (See exhibit "E").

26.

(96)

Plaintiff was found guilty charged and sentenced to Camp D, Raven working cellblocks.

(96A)

On Febuary 1, 2008, plaintiff wrote Warden Burl Cain a letter concerning the harassment and retaliation from security. Plaintiff had his brother mail the letter certify. And failed to get any response. (See exhibit "F").

(96B)

On Febuary 1, 2008, plaintiff wrote Warden Vannoy as well with the same information and he failed to respond as well. (See exhibit "G").

(97)

Months after being in Raven, plaintiff received information Capt. Dufour has a reputation in setting inmates up with handcuff keys. Inmate Fernand Autrey #313537 is on extented lockdown as a result of Capt. Dufour framing him with possessing a homemade handcuff key. He is presently on Camp D, Hawk Unit extented lockdown.

(98)

Upon information and belief, Autrey's incident occurred before plaintiff's, while he was living at Camp S Unit. Capt. Dufour was the shift captain there.

# IV DISCIPLINARY APPEAL
## (99)

On February 11, 2008, plaintiff filed a disciplinary appeal raising the following issues. (See exhibit "H").

1). Plaintiff's Due Process and Civil rights was violated when Capt. Dufour fabricated his writeup in retaliation for exercising his 1st Amendment right.

2). Plaintiff's Due Process and Civil rights was violated when the Disciplinary Board denied him a fair hearing by denying motion to present evidence.

3). Plaintiff's Due Process and Civil rights was violated when Capt. Dufour Filed a False Public Records in retaliation for plaintiff exercising his 1st. Amendment right.

4). The Disciplinary Board denied plaintiff a fair hearing when his motion for an independent investigation was denied.

5). Plaintiff's Due Process and Civil rights was violated when Lt. Bordelon Filed a False Public Records and injuring Public Records

28.

in retaliation for Plaintiff exercising
his 1st Amendment right.

(100)

On March 27, 2008, plaintiff received his denial.
(See exhibit "I").

(101)

On March 27, 2008, plaintiff appealed the denial
to the Secretary of the Department of Correction.
(See exhibit "I").

(102)

On April 16, 2008, the Secretary of the Department
of Correction denied relief. (See exhibit "J").

V ADMINISRATIVE REMEDY PROCEDURE

(103)

On March 25, 2008, plaintiff filed an ARP on the
defendants for harrassment and retaliation. (See
exhibit "K").

(104)

On April 14, 2008, Ms. Trish Foster of Legal Pro-
grams rejected the ARP without reasons. (See ex-
hibit "L").

(105)

On April 15, 2008, plaintiff wrote a letter to Ms.
Foster inquiring about the ARP rejection. (See ex-

hibit "M").

### (106)

On April 27, 2008, plaintiff wrote a letter to Warden Burl Cain when Ms. Foster failed to respond. (See exhibit "N").

### (107)

In May 2008, plaintiff received notice his ARP was accepted. (See exhibit "O").

### (108)

On June 18, 2008, plaintiff received his denial of relief dated June 12, 2008. (See exhibit "P").

### (109)

On June 18, 2008, plaintiff sought review to the Secretary of the Department of Correction. (See exhibit "Q").

### (110)

On June 30, 2008, the Secretary denied relief. (See exhibit "R").

## VI LEGAL CLAIMS

### (111)

Plaintiff reallege and incorporate by reference paragraph 1-110.

### (112)

Defendants James LeBlanc, Burl Cain, Darryl Vannoy,

Tim Delaney and Trish Foster's deliberate indifference
to plaintiff's right to be free from harassment and
intimidation, in violation of the 8th and 14th Amend-
ment of the United States Constitution.

(113)

Defendants James LeBlanc, Burl Cain, Darryl Vannoy,
Tim Delaney and Trish Foster's deliberate indifference
to plaintiff's right to be free from retaliation in
exercising his right to file grievance, in violation of
the 1st and 14th Amendments of the United States
Constitution.

(114)

Defendants Harold Sterling, Eric Hinyard, Susan Con-
rad, Paul Smith, Capt. Patrick Woods and Lt. _____
Cole's harassing and intimidating Plaintiff, violated
his rights, and constituted cruel and unusual
punishment under the 8th Amendment of the
United States Constitution.

(115)

Defendants Harold Sterling, Billy Mock, Eric Hinyard,
Joseph Dufour, Susan Conrad, Paul Smith, Capt. Patrick
Woods, Lt. _____ Cole, Jordan Bordelon and
Cadet Leonard Wilson's actions infringed on Plain-
tiff's rights to be free from retaliation after

31.

exercising his right to file complaint against their supervisor under the 1st and 14th Amendment of the United States Constitution.

(116)

Defendants Harold Sterling, Billy Mock, Joseph Dufour and Jordan Bordelon's actions in fabricating Plaintiff's writeup and planting an alleged home-made handcuff key in Plaintiff's locker box constitution cruel and unusual punishment under the guise of retaliation, in violation of Plaintiff's 1st, 8th and 14th Amendment of the United States Constitution.

(117)

Defendants Billy Mock, Joseph Dufour, Jordan Bordelon and Leonard Wilson's actions falsifying statements inconsistent with the log book, constitute filing False Public Records, Injuring Public Records and Malfeasance in office under the guise of retaliation, in violation of Plaintiff's 1st, 8th and 14th Amendment rights of the United States Constitution.

(118)

The Plaintiff has no plain, adequate or complete remedy at law to redress the wrongs described herein. Plaintiff has been and will continue to be

32.

irreparably injured by the conduct of the defendants
unless this court grants the declaratory and in-
junctive relief which plaintiff seeks.

## III PRAYER FOR RELIEF

### (119)

WHEREFORE, plaintiff respectfully prays that this
court enter judgment granting plaintiffs:

### (120)

A declaration that the acts and omissions described
herein violated plaintiff's rights under the Constitution
and laws of the United States.

### (121)

A preliminary and permanent injunction ordering
all mentioned defendants to stop harassing, intimidating
and retaliating against this plaintiff by causing him
to spend an indefinite period in working cellblock
with a good conduct record for a rule infraction he
did not violate.

### (122)

That plaintiff be given his job back as inmate counsel
and compensated his full incentive pay starting
from his last payment to the present.

### (123)

Compensatory damages in the amount of $50.00

perday against each defendant, jointly and severally for each day their actions caused plaintiff injustice.

(124)

Punitive damages in the amount of $50.00 perday against each defendant for each day plaintiff suffered from their actions and failure to act.

(125)

The writeup be expunged from Plaintiff's prison record.

(126)

A jury trial on all issues triable by jury.

(127)

Plaintiff's costs in this suit.

(128)

Any additional relief this court deems just, proper, and equitable

Thus, signed on this 12th day of December 2008.

Respectfully submitted,

Erin Hunter #111799

Cam D, Raven 2-A-5

Louisiana State Prison

Angola, LA. 70712

34.

## VERIFICATION

I have read the foregoing complaint and hereby verify that the matters alleged therein are true, except as to matters alleged on information and belief, and, as to those, I believe them to be true. I certify under penalty of perjury that the foregoing is true and correct.

Executed at the Louisiana State Penitentiary, in the State of Louisiana on this 12th day of December 2008.

Erin Hunter #111799

35.